806 F.2d 425
 17 Envtl. L. Rep. 20,334, 21 Fed. R. Evid. Serv. 1398
 UNITED STATES of America
v.
ENGLER, Edward. (Two Cases)
Appeal of Edward ENGLER, in Nos. 85-5818 and 85-5819.
UNITED STATES of America, Appellant in Nos. 85-5834 and 85-5835,
v.
ENGLER, Edward.
 Nos. 85-5818, 85-5819, 85-5834 and 85-5835.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 11, 1986.
Decided Nov. 26, 1986.
As Amended Dec. 5, 1986.
Rehearing and Rehearing In Banc Denied Dec. 23, 1986.
 
 Peter T. Campana (argued), Campana & Campana, Williamsport, Pa., for appellant Engler.
 F. Henry Habicht, II, Asst. Atty. Gen., James J. West, U.S. Atty., Harrisburg, Pa., Timothy B. Haney, Asst. U.S. Atty., Harrisburg, Pa., Jacques B. Gelin, Claire L. McGuire (argued), Attys., Dept. of Justice, Washington, D.C., for appellee U.S.
 Before ALDISERT, Chief Judge, and HIGGINBOTHAM and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Chief Judge.
 
 
 1
 We have cross appeals emanating from a prosecution for selling protected wildlife in violation of the Migratory Bird Treaty Act, 16 U.S.C. Secs. 703, 707(b)(2)[1] and for selling explosives in violation of 18 U.S.C. Secs. 2, 842(b). At nos. 85-5818 and 85-5819, Edward Engler appeals from sentences imposed on convictions, contending that the government entrapped him as a matter of law, that he was denied due process as guaranteed by the Fifth Amendment because of "outrageous" conduct of government agents, and that the court erred in an evidentiary ruling at trial. At nos. 85-5834 and 85-5835, the government appeals from the district court's post-trial dismissal of indictments on the basis that the strict liability felony provision of the Migratory Bird Treaty Act, 16 U.S.C. Sec. 707(b)(2), violates the due process clause.
 
 I.
 
 2
 Whatever has been our history as a nation of hunters and trappers, it is clear that Congress has declared that modern outdoorsmen and outdoorswomen may not interfere with migrating birds, and that the taking and sale of these birds is illegal. Edward Engler was prosecuted for violating the Migratory Bird Treaty Act on the basis of the following circumstances.
 
 
 3
 In September 1982, David Kirkland, an undercover agent for the United States Fish and Wildlife Service, met with Edward Engler and Elwood Laudenslager at a "trapper's rendezvous" near North Bend, Pennsylvania. Kirkland represented that he was a dealer in animal parts (e.g. bear claws, raccoon tails) and discussed the possibility of purchasing animal parts from Engler and Laudenslager. Over the next several months, Kirkland and other Fish and Wildlife agents purchased animal and bird parts as well as whole birds from Engler and Laudenslager. Between May 15, 1983 and January 16, 1985, Engler sold the agents birds or bird parts that were protected under the Migratory Bird Treaty Act. Engler and Laudenslager also sold dynamite to the agents.
 
 
 4
 A grand jury returned three indictments against Engler. The first two charged him with one count of selling or aiding and abetting the sale of stolen explosives in violation of 18 U.S.C. Secs. 2, 842(b), and with fifteen counts of selling migratory birds or bird parts in violation of the Migratory Bird Treaty Act, 16 U.S.C. Secs. 703, 707(b)(2). The third charged Engler with one explosives count and one migratory bird count. After a jury trial, Engler was found guilty on all counts. In response to post-trial motions, the district court dismissed the counts brought pursuant to the Migratory Bird Treaty Act but denied Engler's motions for judgment of acquittal and new trial on the remaining counts. We shall first address Engler's contentions.
 
 II.
 
 5
 The first basis of Engler's appeal from the district court's denial of motions for judgment of acquittal or for new trial is his contention that he had established his entrapment as a matter of law because the government failed to introduce evidence sufficient to prove his predisposition to commit the offenses charged. See United States v. Williams, 705 F.2d 603, 613 (2d Cir.), cert. denied, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). On review of the district court's denial of a motion for judgment of acquittal on this issue, the appellate court must apply the same standard that the district court should have used initially:
 
 
 6
 In ruling on a motion to overturn a jury's finding of predisposition the trial court must view the evidence in the light most favorable to the prosecution, and resolve all reasonable inferences therefrom in its favor.... Viewing the evidence in this light, the trial court must uphold the jury's verdict unless no reasonable jury could conclude beyond a reasonable doubt that the defendant was predisposed to commit the offense for which he was convicted.
 
 
 7
 United States v. Jannotti, 673 F.2d 578, 598 (3d Cir.) (in banc), cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).
 
 A.
 
 8
 To be entitled to an entrapment charge in this circuit, "a defendant must first present evidence both that the government initiated the crime ... and that the defendant was otherwise not predisposed to commit the crime." United States v. Gambino, 788 F.2d 938, 943 (3d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986). Once the defendant has profferred such evidence, the burden shifts to the government to disprove the elements of the entrapment defense beyond a reasonable doubt. Jannotti, 673 F.2d at 597. Entrapment is established as a matter of law only "[w]here the evidence is undisputed that the defendant had no predisposition to commit the crimes with which he is charged, and was induced to do so only by the trickery, persuasion or fraud of the government...." Gambino, 788 F.2d at 944.
 
 B.
 
 9
 We are satisfied that the government introduced sufficient evidence to allow a jury reasonably to conclude that Engler was predisposed to take protected birds for commercial purposes in violation of the MBTA and to engage in illegal sales of explosives. Special Agent David Kirkland testified, for example, that it was Engler--not the government agents--who initiated discussions concerning the sale of hawk claws to Kirkland. App. at 226. Notwithstanding Kirkland's admonition that such sales were illegal, id., Engler subsequently telephoned Kirkland and offered to sell hawk claws. Id. at 64-65; see also id. at 226-33.
 
 C.
 
 10
 The government also introduced evidence that Engler initiated discussions with Kirkland concerning the sale of dynamite. See, e.g., app. at 112-15, 294. Engler does not seriously dispute this. He seems to concede that the government introduced sufficient evidence to establish his predisposition regarding the first sale of dynamite, see br. for appellant at 16, yet he fashions a novel argument. He contends that the fact of his predisposition at the time of the first dynamite sale does not establish his predisposition at the time of the second dynamite sale. We must reject this argument. " '[A]n existing course of criminal conduct similar to the crime for which the defendant is charged' " may be introduced to meet the government's burden of proof on predisposition. Gambino, 788 F.2d at 945. Evidence of Engler's initial offer and sale of dynamite is thus sufficient to demonstrate Engler's predisposition to make the second sale. Moreover, a "defendant's predisposition is not to be assessed 'as of that time when he committed the crime,' " because predisposition "refers to the state of mind of a defendant before government agents make any suggestion that he should commit a crime." Williams, 705 F.2d at 618. Engler concedes that the government introduced evidence of his predisposition during the critical time, that is, before the alleged inducement. Accordingly, we conclude that Engler's suggestion that the government failed to introduce evidence sufficient to establish his predisposition at the time of the second dynamite sale is without merit.
 
 D.
 
 11
 Finally, Engler's reliance on United States v. Dion, 762 F.2d 674 (8th Cir.1985), rev'd in part, --- U.S. ----, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986), is misplaced. There, the government contended that the defendant had been predisposed to violate the MBTA because he had "readily and willingly responded to a mere opportunity to kill an eagle for profit." Id. at 686. The court disagreed, finding that the government "had not merely given [the defendant] an opportunity to take or kill an eagle but [had] encouraged [him] to do so by the agents' repeated direct and indirect solicitation over a nearly two-year period." Id. Such circumstances are not present here; on the contrary, the government introduced evidence that Engler actually initiated negotiations for the sale of protected birds.
 
 III.
 
 12
 Engler next contends that the district court erred by denying his motions for acquittal because the conduct of the government agents was so "outrageous" as to violate due process. Similarly, he argues that the district court erred by failing to instruct the jury on his due process defense. Our standard of review is plenary.
 
 A.
 
 13
 In United States v. Russell, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1642-43, 36 L.Ed.2d 366 (1973), the Court indicated, in dictum, that under some circumstances, "the conduct of law enforcement agents [could be] so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." Subsequently, however, a plurality of the Court indicated that the "due process defense" is unavailable where, as here, the defendant willingly commits the crime. Hampton v. United States, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) ("The remedy of the criminal defendant with respect to the acts of Government agents, which, far from being resisted, are encouraged by him, lies solely in the defense of entrapment.").
 
 
 14
 On appeal, Engler merely characterizes the undercover activities of the government as outrageous; he fails to make even the requisite allegations that "the Government activity in question violate[d] some protected right of the defendant." Id. To the extent that Engler contends the government's actions harmed him, his allegations are merely duplicative of his entrapment defense contentions. Such allegations may not provide an independent basis for a defense or acquittal. Id. at 489-91, 96 S.Ct. at 1649-51; see also United States v. Jannotti, 673 F.2d at 608 ("We must be careful not to undermine the [Supreme] Court's consistent rejection of the objective test of entrapment by permitting it to reemerge cloaked as a due process defense.").
 
 
 15
 The government agents' conduct here is easily distinguished from those unusual circumstances that have been held to violate due process. See United States v. Twigg, 588 F.2d 373, 381 (3d Cir.1978)(DEA agents "deceptively implanted the criminal design in [defendant's] mind," and then "set him up, encouraged him, provided the essential supplies and technical expertise and when he ... encountered difficulties in consummating the crime ... assisted in finding solutions."); Greene v. United States, 454 F.2d 783, 786-87 (9th Cir.1971) (government agent involved in illegal activities for over two years supplied materials, operator, and location for illegal still and was sole purchaser of all liquor produced). Engler has not introduced evidence of such government conduct as would "shock[ ] the conscience of the Court," United States v. Beverly, 723 F.2d 11, 13 (3d Cir.1983)(per curiam), or otherwise compel it to overcome its "extreme caution in finding due process violations in undercover settings." United States v. Gambino, 788 F.2d 938, 945 n. 6 (3d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986).
 
 B.
 
 16
 Engler's additional contention that the district court erred by failing to instruct the jury on his due process defense is without merit. The question whether government conduct was so outrageous as to constitute a violation of due process is a question of law to be determined by the court, not the jury. United States v. Salazar, 720 F.2d 1482, 1488 (10th Cir.1983), cert. denied, 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985); United States v. Prairie, 572 F.2d 1316, 1319 (9th Cir.1978); see also United States v. Russell, 411 U.S. at 441, 93 S.Ct. at 1647 (Stewart, J., dissenting) ("[T]he determination of the lawfulness of the Government's conduct must be made--as it is on all questions involving the legality of law enforcement methods--by the trial judge, not the jury.").
 
 IV.
 
 17
 Finally, Engler argues that the district court improperly admitted testimony of Special Agent Kirkland that Kirkland believed the fur trapping company for which Engler had worked had been engaged in illegal activity. Engler alternatively contends that this testimony was irrelevant, inadmissible hearsay, or unduly prejudicial. Because the district court's initial determination of relevancy implicates the interpretation and application of legal precepts, the standard of review is plenary. In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238, 269 (3d Cir.1983), rev'd sub. nom. on other grounds Matsushita Electric Industrial Co. v. Zenith Radio Corp., --- U.S. ----, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir.1981).
 
 
 18
 On cross-examination, Kirkland testified that prior to the start of his investigation he had no reason to believe that Engler was involved in criminal activity. The district court ruled that Kirkland's testimony on redirect that he had suspected Engler's employer of illegal activities was relevant "[t]o refute any conclusion of improper motive or intent" on the part of the government in initiating its investigation of Engler. 627 F.Supp. 196, 200. This court, however, has determined:
 
 
 19
 at least in the context of entrapment, that "it is inconsequential whether law enforcement officials did or did not act on well-grounded suspicion that the defendant was engaging in wrongdoing, or whether they had probable cause for approaching the defendant." ... Where the conduct of the investigation itself does not offend due process, the mere fact that the investigation may have been commenced without probable cause does not bar the conviction of those who rise to its bait.
 
 
 20
 United States v. Jannotti, 673 F.2d 578, 609 (3d Cir.) (in banc)(citations and emphasis omitted), cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). A strong case can be made, therefore, that Kirkland's testimony was irrelevant, and that the court erred in admitting it. Even so, we are not satisfied that this amounted to reversible error. In light of the formidable array of other evidence of Engler's predisposition to commit the offenses charged, it cannot reasonably be maintained that this testimony affected Engler's "substantial rights;" absent prejudice to defendant, the district court's error does not constitute grounds for reversal. See Rule 52(a), F.R. of Crim.P.; United States v. Reynolds, 715 F.2d 99, 104 (3d Cir.1983).V.
 
 
 21
 Accordingly, we conclude that Engler is not entitled to relief in these appeals. We now turn to the government's appeals.
 
 VI.
 
 22
 The Migratory Bird Treaty Act implements provisions of treaties between the United States and Great Britain, Mexico, and Japan for the protection of certain species of migratory birds. As originally enacted, violations of the MBTA or regulations promulgated thereunder were punishable as misdemeanors. See 16 U.S.C. Sec. 707(a). Scienter is not an element of criminal liability under the Act's misdemeanor provisions. See, e.g., United States v. Chandler, 753 F.2d 360, 363 (4th Cir.1985); United States v. Catlett, 747 F.2d 1102, 1104 (6th Cir.1984), cert. denied, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). In 1960 the MBTA was amended to make the sale of protected species a felony. See 16 U.S.C. Sec. 707(b)(2). This amendment was intended to differentiate between "an individual who hunts migratory birds for pleasure" and "a person who slaughters these wildfowl for commercial purposes as a means of livelihood" and therefore to "better protect our migratory game birds." S.Rep. No. 1779, 86th Cong., 2d Sess. 1, reprinted in (1960) U.S. Code Cong. & Ad. News 3459, 3459. The amendment did not add scienter as an element of criminal liability. In effect, the statutory schema presented two factual scenarios for imposing strict liability on those who hunt migratory birds--if the actor hunts for pleasure, it is a misdemeanor; if for commercial purposes, it is a felony.
 
 
 23
 Relying almost exclusively on United States v. Wulff, 758 F.2d 1121 (6th Cir.1985), the district court ruled that the absence of a scienter requirement in the felony provision of the Act violates the due process clause of the fifth amendment. See also United States v. St. Pierre, 578 F.Supp. 1424 (W.D.S.D.1983). In effect, the court condemned the strict liability feature of the Act's felony provision. On appeal, the government concedes that a scienter element is constitutionally required, but contends that the court should infer a scienter requirement from the statutory scheme and congressional purpose. The United States further argues that the indictment alleged and evidence at trial established that Engler acted "knowingly," thereby obviating Engler's due process argument. Because this issue involves the application and interpretation of legal precepts, the standard of review is plenary. United States v. Adams, 759 F.2d 1099, 1106 (3d Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985).
 
 A.
 
 24
 The concurrence and the government urge us to avoid the constitutional issue presented by this case. They argue that this court should supply the missing element of scienter to the MBTA's felony provision, recognize that this element was proven at trial, and, on this basis, remand to the district court for reinstatement of the indictments. This we cannot do. We agree with the district court that to supply an element of specific intent here would be impermissible "judicial legislation." 627 F.Supp. at 199.
 
 
 25
 It is of course well established that "[t]he existence of mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." Dennis v. United States, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1951). The Supreme Court, however, has long recognized that a different standard applies to those federal criminal statues that are essentially regulatory, that are designed to protect the public welfare, and that do not have their origins in the common law. With respect to these offenses, "whatever the intent of the violator, the injury is the same.... [L]egislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element." Morissette v. United States, 342 U.S. 246, 252, 72 S.Ct. 240, 244, 96 L.Ed. 288 (1952). Thus, the "interpretative presumption ... in favor of implying a scienter requirement into an otherwise silent statute," concurrence at 438, more appropriately arises where the offense is one, taken from the common law, that historically includes mens rea. Morissette, 342 U.S. at 262, 72 S.Ct. at 249; accord United States v. Johnson & Towers, Inc., 741 F.2d 662, 665 (3d Cir.1984) ("[T]hough the result may appear harsh, it is well established that criminal penalties attached to regulatory statutes intended to protect public health, in contrast to statutes based on common law crimes, are to be construed to effectuate the regulatory purpose."), cert. denied, 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 321 (1985).
 
 
 26
 As noted above, the MBTA is a regulatory measure designed to protect the public welfare, derived not from the common law but from a series of treaties with other states. Missouri v. Holland, 252 U.S. 416, 435, 40 S.Ct. 382, 384, 64 L.Ed. 641 (1920). Guided by the factors articulated in Morissette, we cannot conclude that the text or history of the Act provides a basis from which to infer an intent requirement.[2] Our reluctance to draw such an inference is bolstered by case law interpreting the MBTA as imposing strict liability. See, e.g., United States v. Catlett, 747 F.2d 1102 (6th Cir.1984), cert. denied, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985); United States v. Brandt, 717 F.2d 955 (6th Cir.1983); United States v. FMC Corp., 572 F.2d 902 (2d Cir.1978); United States v. Green, 571 F.2d 1 (6th Cir.1977); United States v. Ireland, 493 F.2d 1208 (4th Cir.1973); United States v. Wood, 437 F.2d 91 (9th Cir.1971); Rogers v. United States, 367 F.2d 998 (8th Cir.1966), cert. denied, 386 U.S. 943, 87 S.Ct. 976, 17 L.Ed.2d 874 (1967); United States v. Bryson, 414 F.Supp. 1068 (D.Del.1976). But see United States v. Delahoussaye, 573 F.2d 910 (5th Cir.1978) (minimum of scienter required to establish violation of MBTA). Finally, we do not believe that the appearance of the word "deterrent" in the legislative history of the Act's felony provision provides sufficient ground to conclude that Congress intended scienter as an element of the offense.[3] Because we do not believe that this court may rewrite the felony provision of the MBTA to include an intent requirement, we must decide whether the district court erred in holding that the Act, as written, is unconstitutional.
 
 B.
 
 27
 The Sixth Circuit's Wulff opinion builds on the Eighth Circuit's decision in Holdridge v. United States, 282 F.2d 302 (8th Cir.1960), which in turn adopted the philosophy of Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Morissette teaches that proof of intent is not necessary where "penalties ... are relatively small, and conviction does no grave danger to an offender's reputation." Id. at 256, 72 S.Ct. at 246. Similarly, Holdridge explained thatwhere a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.
 
 
 28
 288 F.2d at 310. The inverse of this proposition, also relied on by the district court, was set forth in dictum in United States v. Heller, 579 F.2d 990, 994 (6th Cir.1978): "Certainly, if Congress attempted to define a malum prohibitum offense that placed an onerous stigma on an offender's reputation and that carried a severe penalty, the Constitution would be offended...."
 
 
 29
 The district court accepted this reasoning in toto and determined that because a person acting with an innocent state of mind could be subject to a severe penalty--here, two years imprisonment, a $2,000 fine or both under the felony provision--due process requires the prosecutor to prove that the accused acted with some degree of scienter; and that because Congress failed so to provide, section 707(b)(2) fails to pass constitutional muster. Significantly, the district court made no reference to other strict liability statutes that impose equally or more severe penalties, statutes judged by the Supreme Court to survive constitutional scrutiny.
 
 C.
 
 30
 We are somewhat uncomfortable with the government's concession that the absence of a scienter requirement in the felony provision of the Migratory Bird Treaty Act violates the due process clause. This court, however, is not bound by the government's concession. Rather, we are mindful of our obligation to afford congressional enactments the benefit of all reasonable arguments in favor of constitutionality. See St. Martin Evangelical Lutheran Church, 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981); Lehigh & New England Ry. Co. v. I.C.C., 540 F.2d 71, 81 (3d Cir.1976), cert. denied, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977).
 
 
 31
 We are persuaded that the Sixth Circuit in Wulff, the district court here, and the government have ignored a formidable line of cases imposing strict liability in felony cases without proof of scienter. It is well established that a criminal statute is not necessarily rendered unconstitutional because its definition of a felony lacks the element of scienter. See Lambert v. California, 355 U.S. 225, 228, 78 S.Ct. 240, 242, 2 L.Ed.2d 228 (1957)("We do not go with Blackstone in saying that a 'vicious will' is necessary to constitute a crime ... for conduct alone without regard to the intent of the doer is often sufficient. There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition."); Williams v. North Carolina, 325 U.S. 226, 238, 65 S.Ct. 1092, 1099, 89 L.Ed. 1577 (1945)("The objection that punishment of a person for an act as a crime when ignorant of the facts making it so, involves a denial of due process of law has more than once been overruled."); Shevlin-Carpenter Co. v. Minnesota, 218 U.S. 57, 70, 30 S.Ct. 663, 666, 54 L.Ed. 930 (1910) ("[P]ublic policy may require that in the prohibition or punishment of particular acts it may be provided that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance."); United States v. Greenbaum, 138 F.2d 437, 438 (3d Cir.1943)("The Constitutional requirement of due process is not violated merely because mens rea is not a required element of a prescribed crime."). The Supreme Court has indicated that the due process clause may set some limits on the imposition of strict criminal liability, but it has not set forth definite guidelines as to what those limits might be. See United States v. International Minerals & Chemical Corp., 402 U.S. 558, 564 -65, 91 S.Ct. 1697, 1701-02, 29 L.Ed.2d 178 (1971); Lambert, 355 U.S. at 228, 78 S.Ct. at 242.
 
 
 32
 Reduced to their essence, Wulff, St. Pierre, and the district court decision here made a judgment call that does not withstand reasonable analysis. They hold that the differences between a felony fine of $2,000 and a misdemeanor fine of $500, between a two-year felony sentence and a six-month misdemeanor sentence, between the stigma of a felony conviction and that of a misdemeanor conviction turn the trick on constitutionality.[4] Mechanical jurisprudence has no place here. The constitutionality of acts of Congress should not be determined by such nice distinctions, with tight mathematical formulas derived from a pocket calculator or a computer spread sheet. The differences between the objective penalties of the misdemeanor and felony provisions of the Act is, for due process purposes, de minimis. Moreover, we are unwilling to accept that it is axiomatic, or proved by experience or empirical data, that there is, in the Morissette formulation, a "grave danger to an offender's reputation" when he is sentenced to two years imprisonment (eight months actual incarceration) under the felony provision, but no such danger when he is sentenced to six months imprisonment (six months actual incarceration) under the misdemeanor provision. Nor should the differences in the fines compel the conclusion that one's reputation is not besmirched by a $500 fine, but is unconstitutionally tarnished by an additional levy of $1500.
 
 
 33
 The concurrence argues that the "qualitative" difference between a felony and a misdemeanor conviction under the Act is constitutionally significant. Concurrence, at 439-40. In United States v. Greenbaum, 138 F.2d 437 (3d Cir.1943), however, this court expressly rejected reasoning similar to that of Wulff, St. Pierre, the district court here and the concurrence. Although the defendants in Greenbaum were apparently charged under the misdemeanor provisions of a statute prohibiting the introduction of impure food into interstate commerce, the court noted that the statute included felony provisions for repeat offenders. Id. at 438 n. 1. In affirming that the mere absence of an intent requirement did not violate due process, the court stated:
 
 
 34
 While the absence of any requirement of mens rea is usually met with in statutes punishing minor or police offenses (for which fines, at least in the first instance, are ordinarily the penalties), we think that interpretation of legislative intent as dispensing with the knowledge and wilfulness as elements of specified crimes is not to be restricted to offenses differentiable upon their relative lack of turpitude. Where the offenses prohibited and made punishable are capable of inflicting widespread injury, and where the requirement of proof of the offender's guilty knowledge and wrongful intent would render enforcement of the prohibition difficult if not impossible (i.e., in effect tend to nullify the statute), the legislative intent to dispense with mens rea as an element of the offense has justifiable basis.
 
 
 35
 Id. at 438 (emphasis supplied). See also Shevlin-Carpenter, Inc., 218 U.S. at 70, 30 S.Ct. at 667 ("[L]egislation may, in particular instances be harsh, but we can only say again what we have so often said, that this court cannot set aside legislation because it is harsh.").
 
 
 36
 To decide cases on constitutional law, to be sure, is to draw lines and to make judgment calls. But where differences between misdemeanor and felony penalties are as close as they are here, we feel that the analysis takes place on a very slippery slope with too much "in the eye of the beholder." Too much subjectivity abides in such an approach to rely on such fine distinctions as are present here.[5] Accordingly, we reject the analysis of the district court, and elect not to follow the approach of the Sixth Circuit.
 
 D.
 
 37
 This does not end our analysis. We prefer instead to draw what we consider to be proper analogies from those cases reviewing the constitutionality of other strict liability crimes. The Supreme Court and the Fifth and Seventh Circuits have affirmed the constitutionality of strict liability crimes carrying penalties of equivalent or greater severity than those at issue here. See, e.g., United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (possession of unregistered firearm; fines up to $10,000 and/or imprisonment up to ten years); Williams v. North Carolina, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) (bigamous cohabitation; up to ten years imprisonment); United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (shipment of misbranded or adulterated drugs; fines up to $1,000 and/or imprisonment up to one year for first offense, $10,000 and/or three years for subsequent offense); United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (unlawful drug sale; imprisonment up to five years); Shevlin-Carpenter Co. v. Minnesota, 218 U.S. 57, 30 S.Ct. 663, 54 L.Ed. 930 (1910) (cutting timber on state land; fines up to $1,000 and/or imprisonment up to two years); Stepniewski v. Gagnon, 732 F.2d 567 (7th Cir.1984) (home improvement trade practices violations; fines up to $5,000 and/or imprisonment up to one year); United States v. Ayo-Gonzalez, 536 F.2d 652 (5th Cir.1976) (fishing in United States contiguous fishing zone; fines up to $100,000 and/or imprisonment up to one year), cert. denied, 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977).
 
 
 38
 An alternative to the Holdridge-Heller test may be inferred from these cases, particularly in light of United States v. Freed. There, the Court distinguished two types of strict liability crimes. Strict liability for omissions which are not "per se blameworthy" may violate due process because such derelictions are " 'unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed.' " 401 U.S. at 608, 91 S.Ct. at 1118, quoting Lambert v. California, 355 U.S. at 228, 78 S.Ct. at 243 (law imposing strict criminal liability on convicted felons who fail to register when remaining in Los Angeles for more than five days violates due process). By contrast, due process is not violated by the imposition of strict liability as part of "a regulatory measure in the interest of public safety, which may well be premised on the theory that one would hardly be surprised to learn that [the prohibited conduct] is not an innocent act." 401 U.S. at 609, 91 S.Ct. at 1118, citing United States v. Dotterweich (shipping adulterated and misbranded drugs) and United States v. Balint (selling narcotics).
 
 
 39
 The capture and sale of species protected by the MBTA is not "conduct that is wholly passive," but more closely resembles conduct "that one would hardly be surprised to learn ... is not innocent." The prohibition of such sales furthers "a national interest of very nearly the first magnitude." Missouri v. Holland, 252 U.S. 416, 435, 40 S.Ct. 382, 384, 64 L.Ed. 641 (1920). Under the Freed test, the strict liability provisions of the MBTA do not offend the requirements of due process. We so hold.
 
 VII.
 
 40
 The judgment of the district court dismissing the Migratory Bird Treaty Act indictments will be reversed and the case remanded to the district court with a direction to reinstate the jury's verdict of guilty and to proceed with sentencing. All other aspects of the district court's judgment will be affirmed.
 
 
 41
 A. LEON HIGGINBOTHAM, JR., concurring in result.
 
 
 42
 Although I join the majority in all respects with regard to claims raised by Engler on this appeal, I cannot join in the reasoning adopted to resolve the government's challenge of the district court's determination that the felony provisions of the Migratory Bird Treaty Act ("MBTA") are unconstitutional. Because the majority gratuitously and, I think, ill-advisedly concludes that the felony provisions of the MBTA satisfy the requirements of due process even if construed to impose strict liability, I write separately to express my views.
 
 I.
 
 43
 The government appeals from the district court's determination that because the felony provisions of the MBTA impose harsh penalties and conviction thereunder "gravely besmirch[es]" the offender's reputation, Holdridge v. United States, 282 F.2d 302, 310 (8th Cir.1960), the absence of a scienter requirement offends due process.
 
 
 44
 Engler was indicted, inter alia, for violations of the MBTA, 16 U.S.C. Secs. 703 and 707(b), in two separate indictments. After the jury returned a verdict of guilty on all charges, Engler filed a motion for permission to challenge the constitutionality of Sec. 707(b)(2) based on the intervening decision of the Sixth Circuit in United States v. Wulff, 758 F.2d 1121 (6th Cir.1985). In Wulff the Sixth Circuit held the felony provisions of the MBTA unconstitutional reasoning that the absence of an express scienter requirement violates a defendant's right to due process. In reliance on Wulff, the district court in the instant appeal dismissed the felony indictments against Engler.
 
 
 45
 The government advances a three-prong argument which it maintains mandates reversal of the district court's holding. First, the government argues that "the purpose of amending the MBTA to provide felony penalties for commercial exploitation of migratory birds was to distinguish between the pleasure hunter and those who kill birds as part of a business enterprise." Opening Brief for the United States at 8. The government considers this distinction significant in determining the meaning of Sec. 707(b)(2) of the MBTA. In that regard the government argues that the "district court's conclusion that Section 707(b)(2) contains no scienter requirement essentially equates the offenses covered by that section with the general misdemeanor provisions of Section 707(a). The implication of a scienter requirement into the felony provision, on the other hand," the government maintains, "furthers the apparent congressional intent to distinguish between the offenses covered by the two provisions." Opening Brief for the United States at 9 (footnotes omitted). Second, the government argues that this court is not constrained either by case law in this circuit or Supreme Court precedent from implying a scienter element into the felony provisions of the MBTA. Finally, the government concludes by arguing that the evidence presented to the district court firmly establishes that Engler knowingly violated the law, thereby satisfying the scienter requirement it urges us to imply.
 
 
 46
 The district court's post-trial conclusion that Sec. 707(b)(2) contains no scienter requirement was based on its understanding of judicial power in construing ambiguous Congressional legislation. The court reasoned that (1) before a court may imply criminal intent as an element of a statute that is silent on the issue it must look to the intent of Congress, (2) that nothing in the legislative history of the MBTA (as construed in Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920)), suggests that Congress intended scienter as an element, and finally that (3) because Congress intended no scienter requirement for the felony provision of MBTA that a) carries a serious penalty and b) gravely besmirches the reputation of an offender, that provision offends the due process clause of the Fifth Amendment. The district court refused to save the felony provision from constitutional infirmity, noting instead that "[t]o include a specific intent requirement would be judicial legislation." App. at 43.
 
 
 47
 In essence, the government simply asks us to determine whether the district court erred in not implying a scienter requirement in the felony provision of the MBTA. "[S]omewhat uncomfortable with the government's apparent concession that the absence of a scienter requirement in the felony provision of the Migratory Bird Treaty Act violates the due process clause," Maj. at 433, however, the majority addresses the more difficult issue whether scienter must be an included element of a felony offense under the MBTA. Dismissing as "[m]echanical jurisprudence," Maj. at 434, the distinctions drawn between the misdemeanor and felony penalties, the majority concludes that the "close" difference between the misdemeanor and felony penalties of the MBTA cannot "turn the trick on constitutionality." Id. Rather, the majority holds that because "sale of species protected by the MBTA is not 'conduct that is wholly passive,' but more closely resembles conduct 'that one would hardly be surprised to learn ... is not innocent,' ... the strict liability provisions of the MBTA do not offend the requirements of due process." Maj. at 435. Because I think this is an issue we need not, and should not, address on the facts of this case, and more important, because I believe it is far from clear that the Supreme Court would adopt similar reasoning, I respectfully depart from the majority's judgment.
 
 II.
 
 48
 As recognized by the majority, federal courts have an "obligation to afford congressional enactments the benefit of all reasonable arguments in favor of constitutionality." Maj. at 433 (citing St. Martin Evangelical Lutheran Church, 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981)). In the instant appeal, the government reasonably argues that the 1960 amendment to the MBTA prescribing felony penalties for the commercial exploitation of migratory birds implicitly contains a scienter requirement thereby distinguishing it from the misdemeanor penalties under the Act. Thus, the government asserts, the district court should have implied a scienter requirement into the felony provisions of the MBTA. This position is bolstered by the recent decision of the Supreme Court in Liparota v. United States, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). Liparota addressed the question whether in a prosecution under the federal statute governing food stamp fraud the government was required to prove not only that a defendant knowingly acquired or possessed food stamps but also that s/he knew that s/he did so in an unauthorized manner. In the course of interpreting the statute there at issue the Court noted that " '[c]ertainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement' and that criminal offenses requiring no mens rea have a 'generally disfavored status.' "[1] Id. 105 S.Ct. at 2088 (quoting United States v. United States Gypsum, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)).
 
 
 49
 In general, then, the interpretative presumption is in favor of implying a scienter requirement into an otherwise silent statute. See Opening Brief for the United States at 13. In particular, it is my judgment that the legislative history of the specific statutory provision here at issue, viz. section 707(b)(2), suggests that while Congress sought to impose more severe penalties on commercial offenders of the MBTA, it sought to do so only where those offenders exhibited some degree of culpability.[2] The legislative history states:
 
 
 50
 that heavier penalties, together with the forfeiture of boats, guns, and other equipment used by commercial hunters should be a deterrent to those engaged in this illegal traffic, and is a needed addition to existing law. On the other hand, ... not ... every purchaser of migratory birds should be exposed to such a heavy penalty.... [Rather, they] should be subject to ... the misdemeanor fine of up to $500, imprisonment of up to 6 months, or both....
 
 
 51
 S.Rep. No. 1779, 86th Cong., 2d Sess. 1, reprinted in (1960) U.S. Code & Ad.News 3459, 3460 (emphasis added). Contrary to the majority's assertion that the "statutory schema presented two factual scenarios for imposing strict liability" under the misdemeanor and felony provisions of the MBTA, Congress's express desire to deter commercial exploitation of migratory birds implicates culpable as opposed to innocent conduct as the target of the felony provisions. In other words, Congress was more concerned with the deliberate slaughter of migratory birds for profit. Thus, as a matter of statutory construction, I would hold that the district court erred in failing to imply a scienter requirement in Sec. 707(b)(2) of the MBTA, and accordingly, it was error to dismiss the indictment pursuant to that provision.
 
 
 52
 I note that the posture in which this case reaches this court, as a prudential matter, also encourages this approach. We are not faced here with the pre-trial dismissal of an indictment on the ground that it charges the defendant under a provision deemed to be unconstitutional as in Wulff. Instead, we are asked to consider the propriety of the district court's actions in dismissing the indictment after a full trial on the merits. Moreover, the indictment charged Engler with "knowingly" violating the statute and the court charged the jury accordingly. Thus, if the evidence in fact established "knowledge," as the government contends, all that due process requires was met in this case. We need not reach the question whether as a matter of constitutional law scienter is a required element of a felony offense under the MBTA.[3] Were we compelled to do so, however, I would remain unpersuaded by the reasoning employed by the majority to conclude that Sec. 707(b)(2), construed as a strict liability provision, satisfies the demands of due process.
 
 III.
 
 53
 Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) sanctions strict liability crimes where "penalties ... are relatively small, and conviction does no grave danger to an offender's reputation." Id. at 256, 72 S.Ct. at 246. Focusing primarily on the severity of the penalty prong of the Morissette calculus, the majority concludes that the marginal differences between the possible sentences under the misdemeanor and felony provisions of the MBTA are not differences that make a difference as a matter of constitutional law. Although I would not lend my unqualified support to the majority's analysis of the quantitative distinction between a sentence under the felony provisions of the MBTA in contrast to a misdemeanor sentence, my concern is with the cursory fashion in which it deals with the second prong of the Morissette calculus, viz. the damage to reputation factor. Because I believe that there are very serious, tangible, collateral consequences that attach to one's reputation as a convicted felon, I would require at least a minimal showing of intent before an accused is convicted under Sec. 707(b)(2), which, I believe, proscribes neither a "public welfare offense"[4] nor conduct that the ordinary citizen would recognize as wrong.
 
 
 54
 The majority's reluctance to recognize a due process concern at the second level of Morissette stems from its belief that "it is [not] axiomatic, or proved by experience or empirical data, that there is, in the Morissette formulation, a 'grave danger to an offender's reputation' " when sentenced to a longer term of imprisonment under the felony provisions of the MBTA. Maj. at 434. The majority's focus again is on the quantitative differences between the possible sentences under the two provisions. Shifting the focus to the qualitative differences between conviction pursuant to the two provisions, however, I cannot conclude with sanguinity that a conviction under a strict liability felony provision of the MBTA does not offend due process.
 
 
 55
 During oral argument some concern was expressed as to our ability to recognize the collateral consequences of felony convictions; consequences which I think highlight the qualitative differences between convictions under Sec. 707(a) and (b):
 
 
 56
 MR. CAMPANA: ... I think, therefore, there is a significant difference between a misdemeanor and a felony.:
 
 
 57
 * * *
 
 
 58
 MR. CAMPANA: Just because of the word "felony"; the connotation of the word "felony."
 
 
 59
 THE COURT: Just because the word is a label you're saying?
 
 
 60
 MR. CAMPANA: Your Honor, we go through life--
 
 
 61
 THE COURT: As distinguished from a person that's been in jail on whatever the diminished term is, that a misdemeanor would carry the difference there?
 
 
 62
 MR. CAMPANA: I think there is a big difference. When you fill out a job application, they want to know if you were convicted of a felony. When you fill out an application for admission to college, they want to know if you were convicted of a felony.
 
 
 63
 THE COURT: I think it goes also a bit further: [They ask,] [h]ave you ever been arrested?
 
 
 64
 MR. CAMPANA: Then they ask the next question: Felony or misdemeanor? They make a distinction--everyday in life--between a felony and misdemeanor. They don't look at the divergent penalties involved; they look at the label. Yes, they do.
 
 
 65
 THE COURT: As to the extent of opprobrium between felony and misdemeanor, is this a matter which we take judicial notice of? This is a judicial notice [concept]?
 
 
 66
 MR. CAMPANA: I think so, Your Honor. I think it's a matter of widespread knowledge.
 
 
 67
 Indeed, the Supreme Court has long recognized in other contexts the private discrimination and civil disabilities that often befall a convicted felon. As Chief Justice Earl Warren noted in his dissenting opinion in Parker v. Ellis, 362 U.S. 574, 80 S.Ct. 909, 4 L.Ed.2d 963 (1960), "[c]onviction of a felony imposes a status upon a person which not only makes him vulnerable to future sanctions through new civil disability statutes, but which also seriously affects his reputation and economic opportunities." Id. at 593-94, 80 S.Ct. at 920. See generally Special Project, The Collateral Consequences of a Criminal Conviction, 23 Vand.L.Rev. 929 (1970); Note, Civil Disabilities of Felons, 53 Va.L.Rev. 403 (1967). Although it may be unclear in a given case what specific disabilities may attach to a felony conviction, it is "the obvious fact of life that most criminal convictions do entail adverse collateral legal consequences." Sibron v. New York, 392 U.S. 40, 55, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968). See also Tuten v. United States, 460 U.S. 660, 663-64 & n. 7, 103 S.Ct. 1412, 1414-15 & n. 7, 75 L.Ed.2d 359 (1983) (recognizing in general, the collateral consequences of felony convictions); Missouri v. Hunter, 459 U.S. 359, 372, 103 S.Ct. 673, 681, 74 L.Ed.2d 535 (1983) (Marshall, J., dissenting) (noting the collateral consequences in the context of a first-degree robbery conviction); Lane v. Williams, 455 U.S. 624, 630-33, 102 S.Ct. 1322, 1326-28, 71 L.Ed.2d 508 (1982) (acknowledging the existence of collateral consequences but holding that they do not attach to recorded parole violations); id. at 634, 102 S.Ct. at 1328 (Marshall, J., dissenting) (noting that the Supreme "Court has consistently refused to canvass state law to ascertain 'the actual existence of specific collateral consequences,' and has presumed that such consequences exist"); Baldasar v. Illinois, 446 U.S. 222, 226-27, 100 S.Ct. 1585, 1587-88, 64 L.Ed.2d 169 (1980) (per curiam) (Marshall, J., concurring) (noting in passing "all the serious collateral consequences that a felony convictions entails"); Blackledge v. Perry, 417 U.S. 21, 28 n. 7, 94 S.Ct. 2098, 2103 n. 7, 40 L.Ed.2d 628 (1974) (observing that "conviction of a 'felony' often entails more serious collateral consequences than those incurred through a misdemeanor conviction"); Baldwin v. New York, 399 U.S. 66, 69, 90 S.Ct. 1886, 1888, 26 L.Ed.2d 437 (1970) (noting "[a]s in most States, ... in New York ... the collateral consequences attaching to a felony conviction are more severe than those attaching to a conviction for a misdemeanor"); Benton v. Maryland, 395 U.S. 784, 790, 89 S.Ct. 2056, 2060, 23 L.Ed.2d 707 (1969) (generally noting the adverse legal consequences of felony convictions); Sibron, 392 U.S. at 55, 88 S.Ct. at 1898 (reviewing Supreme Court case law development on the question of collateral consequences of criminal convictions and noting that "the Court abandoned all inquiry into the actual existence of specific collateral consequences and in effect presumed that they existed."). Thus, it has been traditionally recognized that collateral consequences of felony convictions are both inevitable and serious.
 
 
 68
 Notwithstanding the grave consequences that attach to any felony conviction, it is true that the Supreme Court has not held that felony convictions may be had only upon proof of scienter. Indeed, it has never squarely confronted the issue. In Williams v. North Carolina, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1944), the Court upheld felony bigamy convictions in part because "[m]istaken notions about one's legal rights are not sufficient to bar prosecution for crime." Id. at 238, 65 S.Ct. at 1099. The Williams Court was not asked to consider the nature of the penalty imposed for violation of the state bigamy statute or the ramifications thereof; rather, the Court was asked to decide whether, under the circumstances of that case, the petitioners could be penalized at all.[5] Similarly, in Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), the Court's concern was with the criminalization of "conduct that is wholly passive." Id. at 228, 78 S.Ct. at 243. Although the Court addressed the issue of due process, its emphasis was on the nature of the conduct punished as opposed to the nature of penalty itself. Under Lambert, any penalty--whether felony or misdemeanor--for "wholly passive" conduct would not have been sanctioned. United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), and United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922), cited by the majority, see maj. at 435, are all distinguishable from this case in that they regulate conduct that poses a threat to the public safety. The protection of migratory birds, albeit a legitimate issue of public concern, can hardly be equated with the health and safety concerns associated with hand-grenades and drug distribution. Finally, although the Court in Shevlin-Carpenter Co. v. Minnesota, 218 U.S. 57, 30 S.Ct. 663, 54 L.Ed. 930 (1910), acknowledged that public policy may sometimes require non-recognition of defenses of ignorance or good-faith, the Court has since limited the category of those offenses in which the strict criminal liability may be imposed. See United States v. United States Gypsum Co., 438 U.S. 422, 436-38, 98 S.Ct. 2864, 2873-74, 57 L.Ed.2d 854 (1978). A violation of the MBTA simply does not fall into the category of felony offenses that the Supreme Court has recognized as constitutional without proof of scienter. Namely, the sale of bird parts is neither a public welfare offense nor conduct that an average person would realize was criminal, much less felonious. Had the majority properly considered the Supreme Court's decision in Liparota perhaps these distinctions would have been evident. See 105 S.Ct. at 2092. Instead, it creates a new category of strict liability felony offenses to which any unsuspecting citizen may fall prey.
 
 
 69
 Under the majority's approach an unassuming tourist who, without knowledge that a particular bird is a protected species, picks up a carcass from alongside the highway may be subject to a felony conviction and all of the attendant consequences if s/he later sells or offers to sale the bird to a government agent, or even an admiring neighbor. I simply cannot join in a "judgment call[ ]" that permits such a result. As recognized by the majority "[t]he Supreme Court has indicated that due process may set some limits on the imposition of strict criminal liability." Maj. typescript at 433. I do not think that this case presents us with the opportunity to determine precisely what those limits should be. On this record, however, no due process violation has occurred. I would reverse the judgment of the district court dismissing the indictment under the felony provisions and remand for resentencing.
 
 
 
 [1]
 Relevant sections of the Migratory Bird Treaty Act (MBTA) provide:
 Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat.1702), the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, and the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972.
 16 U.S.C. Sec. 703.
 * * *
 (a) Except as otherwise provided in this section, any person, association, partnership, or corporation who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulation made pursuant to this subchapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $500 or be imprisoned not more than six months, or both.
 (b) Whoever, in violation of this subchapter, shall--
 (1) take by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to barter such bird, or
 (2) sell, offer for sale, barter or offer to barter, any migratory bird shall be guilty of a felony and shall be fined not more than $2,000 or imprisoned not more than two years, or both.
 16 U.S.C. Sec. 707(a), (b).
 
 
 [2]
 The Supreme Court's decision in Liparota v. United States, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), on which the concurrence substantially relies, is not inconsistent with our approach here. Liparota concerned the proper mens rea requirement of a federal statute imposing criminal sanctions for violation of section 15(b) of the Food Stamp Act of 1964, 7 U.S.C. Sec. 2024(b). The Court determined that proof of the offender's knowledge of the illegality of his actions was a necessary element of a criminal prosecution under the statute
 Due process was not at issue in Liparota. Unlike the provisions of the MBTA it was undisputed that section 2024(b) contained some scienter requirement. Id. 105 S.Ct. at 2087; see 7 U.S.C. Sec. 2024(b) ("[W]hoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in a manner not authorized by this chapter ... shall ... be guilty of a felony....") (emphasis supplied). The only issue was the precise nature of that requirement. Moreover, the Court in Liparota specifically held that section 2024(b) was not the type of offense subject to the analysis of United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). See Liparota, 105 S.Ct. at 2092. By contrast, it is clear that the MBTA falls within the continuum of strict liability crimes discussed in Freed. See infra at 441.
 
 
 [3]
 Similarly, we do not find support in the legislative history for the Sixth Circuit's statement that when adding the felony provision to the MBTA, "[i]t is quite likely that Congress omitted to require proof of scienter due to oversight." United States v. Wulff, 758 F.2d 1121, 1124 n. 1 (6th Cir.1985)
 
 
 [4]
 The decisions in Wulff and St. Pierre did not condemn the misdemeanor provisions of the Act. See Wulff, 758 F.2d at 1124; St. Pierre, 578 F.Supp. 1428-29. Rather, the courts there appear to have established a bright-line rule: the onerous stigma necessarily conferred by any felony conviction will always violate due process if liability is not predicated on scienter. See Wulff, 758 at 1125, 1125 n. 2 ("a felony conviction irreparably damages one's reputation," citing Morissette, 342 U.S. at 260, 72 S.Ct. at 248 ("[T]he infamy is that of a felony, which, says Maitland, is '... as bad a word as you can give to a man or thing.' ")); St. Pierre, 578 F.Supp. at 1429 ("There can be no question but that a felony conviction irreparably damages a person's reputation in this respect.")
 
 
 [5]
 It is not necessary for us to draw a bright line where the Morissette formulation may properly be triggered, but we would be more comfortable in doing so if the misdemeanor/felony difference were substantially more pronounced, as, for example, at common law. Felonies were defined at common law as crimes that had the potential of being punishable by death. These offenses included homicide, mayhem, arson, rape, robbery, burglary, larceny, prison breach and rescue of a felon. Although this common law list was greatly enlarged by statute, Parliament continued to emphasize capital punishment as the chief characteristic of a felony. "Misdemeanor" was the label ultimately applied to all other, non-capital offenses. See R. Perkins & R. Boyce, Criminal Law, 13-15 (3d ed. 1982), citing 4 W. Blackstone, Commentaries. We would also be more comfortable if empirical data from psychologists and sociologists were present in the record in this case to furnish guidance as to when "the grave danger to an offender's reputation" does or does not attach
 
 
 [1]
 The majority attempts to minimize the significance of Liparota by noting that "[d]ue process was not at issue in Liparota." Maj. at 432 n. 2. It is precisely because of the Liparota Court's recognition of and allegiance to the above-quoted principle, however, that the due process issue was averted. Similarly, in the instant case, as acknowledged by both parties, recognition of a minimum culpability requirement would satisfy the demands of due process. (Of course, Engler does not challenge the propriety of a scienter requirement as an element of a Sec. 707(b)(2) offense. Rather, he challenges both the power of Congress to omit it and the authority of the courts to imply it.)
 
 
 [2]
 The government similarly construes the statute to require some culpability. At oral argument the following colloquy took place:
 THE COURT: ... What is the Government's position as to how the implied scienter comes into this case?
 MS. MCGUIRE: Your Honor, the scienter requirement would be that a defendant knows that he is selling a bird or bird parts, and that bird or bird parts generally are protected by federal law.
 THE COURT: And there are two pieces: One, the bird, and the selling of it.
 MS. MCGUIRE: Right. And in fact if someone sold, let's say a necklace made of hawk talons, but in fact was acting under a good-faith belief that they were made from some man-made, let's say plastic, that that would be a good defense to a prosecution if they in fact could establish that.
 THE COURT: ... If you were to condense this whole argument to say how we're finding implied scienter, what would you say?
 MS. MCGUIRE: That in order to be convicted of a felony under this statute, a defendant must act knowingly that what he sold was a bird or bird parts, and that, in fact, bird or bird parts were protected by law.
 
 
 [3]
 Assuming arguendo that scienter is not an element of Sec. 707(b)(2), in the instant appeal the government merely overproved its case. I emphasize that this appeal comes to us after a full trial on the merits. The indictment clearly charged Engler with a knowing violation, and, by virtue of his entrapment defense, Engler concedes all elements of the offense with which he is charged. Moreover, during oral argument, counsel for appellant acknowledged that the "knowingly" instruction given to the jury was consistent with a construction of the MBTA that required proof of scienter before one could be convicted under the felony provisions of that statute. Thus, there is no impediment to our directing reinstatement of the convictions of Engler pursuant to Sec. 707(b)(2) and remanding for resentencing
 
 
 [4]
 Public welfare offenses, first defined by the Supreme Court in Morissette, 342 U.S. at 252-53, 72 S.Ct. at 244-45, proscribes the "type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety." Liparota, 105 S.Ct. at 2092
 
 
 [5]
 Williams involved the prosecution of a man and woman who, domiciled in North Carolina, left their spouses in North Carolina, obtained decrees of divorce in Nevada, married and returned to North Carolina to live. North Carolina refused recognition of the Nevada divorce decrees and the petitioners were convicted of bigamy. The Supreme Court noted that petitioners "assumed the risk" both that North Carolina would not recognize the Nevada divorces as valid and that that decision would be upheld by the Court. The facts of Williams and the passing comment quoted by the majority, see maj. at 433, is simply inapposite to the issues involved in the instant appeal