IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,014

STATE OF KANSAS,
*Appellee*,

v.

DANIEL EARL GENSON III,
*Appellant*.

SYLLABUS BY THE COURT

The strict liability character of a KORA registration violation offense bears a rational relationship to the legitimate government interest of protecting the public from sexual and other violent offenders and is thus not unconstitutionally arbitrary.

Review of the judgment of the Court of Appeals in 59 Kan. App. 2d 190, 481 P.3d 137 (2020). Appeal from Riley District Court; GRANT D. BANNISTER, judge. Opinion filed July 29, 2022. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*David Lowden*, deputy county attorney, argued the cause, and *Barry R. Wilkerson,* county attorney, *Bethany C. Fields*, deputy county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

PER CURIAM: Daniel Earl Genson III challenges the Court of Appeals decision affirming his conviction for violating the Kansas Offender Registration Act by failing to register. The issue is whether the Legislature's decision to make the crime of failure to

1

register a strict liability felony violates Genson's substantive due process rights. We conclude it does not.

## FACTS AND PROCEDURAL BACKGROUND

After his conviction for attempted voluntary manslaughter, Genson needed to register as a violent offender under KORA. On August 29, 2017, he did so at the Riley County Police Department. There, he met investigations secretary Shannon Ascher, who described his demeanor as "normal." The forms Genson completed informed him he had to register every May, August, November, and February, and again upon certain occasions, such as when his address changed. Ascher told Genson about these requirements. On September 18, Genson came in to report a change of phone number. He came in again on October 9 to report an address change.

But Genson failed to show up for his registration appointment in November. This does not, itself, establish a failure to register; Genson had until the end of the month to fulfill his registration obligations. To help "make sure he [didn't] miss that month," Ascher tried to call Genson at his own number and his mother's number. Ascher ultimately failed to reach him, and Genson did not register in November. But he registered on December 15 and appeared "normal" at that time.

The State charged Genson with a violation of KORA under K.S.A. 2017 Supp. 22-4903(a) and (c)(1)(A), a severity level six felony, based on his failure to report in person during the month of November 2017. Before trial, the parties stipulated Genson had been convicted of a non-sexual crime requiring registration under KORA. Genson filed a notice of intent to assert a defense of mental disease or defect with no accompanying information, but the State objected because K.S.A 2020 Supp. 21-5203(e) eliminated any

2

mens rea element for a KORA violation, making it a strict liability offense. In reply, Genson argued, among other things, that the State's construction would allow for the conviction of "an individual who falls into a coma during his month of registration and is physically and mentally incapable of complying with K.S.A. 22-4901 et seq." Genson did not clearly articulate an argument that *his* mental illness rendered him physically incapable of complying with his registration obligations. Nor did Genson's reply raise a constitutional claim, although he would later develop the same arguments in challenging the statute's constitutionality. The district court rejected Genson's request for his mental-disease-or-defect defense, agreeing with the State that mens rea is not an element of the crime charged. Accordingly, it held Genson's mental health in November of 2017 was irrelevant.

The case went to jury trial. During trial, the State asked the district court to bar any mention of Genson's mental health because it was not relevant to the crime charged. Genson's attorney noted that Genson had been involuntarily committed at Osawatomie State Hospital for roughly the first half of December 2017, and challenged the constitutionality of strict liability registration violation offenses. Genson's attorney asserted Genson had a constitutional right to present his mental health defense, that he did not "believe that the strict liability statute for KORA is constitutional, period," and that "there's a constitutional argument as to the statute and as to why mental health issues should be able to be discussed to the jury." While Genson's counsel referenced physical incapacity briefly, he did not argue that Genson was physically *unable* to comply with his registration obligations by virtue of a mental disease or defect or that Genson's conduct was involuntary under K.S.A. 2020 Supp. 21-5201(a).

The district court did not rule on the statute's constitutionality but repeated the substance of its previous written ruling "that generally questions, inquiries, evidence, or

3

for that matter argument related to defense of mental defect are not going to be allowed." As the district court put it, a ruling on the statute's constitutionality "will be the Appellate Court's function." In its eventual Journal Entry of Jury Trial, the district court characterized this as a ruling on the State's motion "in limine."

At the end of the State's case, Genson's counsel made these proffers of "what testimony would have been if this Court had allowed us to go into mental health issues":

- Ascher "is familiar with K.S.A. 22-4904 regarding the duties of parties such as state hospitals, i.e., Osawatomie State Hospital."
- "This court and the State of Kansas had involuntarily committed Mr. Genson to Osawatomie" after Genson "actually took himself to a hospital."
- Genson "would have testified that he had not been on his medications in the month of November, that he became cognizant enough to reach out to his mother to ask for transportation to go to the hospital because he knew he needed help. He was unable to reach his mother and Mr. Genson was able to get himself to the hospital. He would testify he believed that would be the end of November, beginning of December."
- Genson "would have been in the hospital on December 2nd."
- "He spent his time at Osawatomie up through December 14th. When he was out of Osawatomie and medicated on his proper treatment plan, he registered the following day."

Once Genson had been committed in the beginning of December of 2017, his counsel argued, it was the hospital's responsibility to register him, meaning he was only "technically incompliant" for "a day to day and a half." Except for the above-referenced

4

proffer, Genson introduced only one exhibit: his registration form from December 15, 2017. He put forth no other evidence.

Genson was found guilty. Before sentencing, Genson moved to dismiss the case because K.S.A. 2020 Supp. 21-5203(e) was "unconstitutional under the Due Process Clause" as it applied a strict liability standard to a crime of inaction. Genson also filed a Renewal of Motion for Judgment of Acquittal, Motion for Judgment Notwithstanding the Verdict, and Motion for a New Trial, in which he argued, *inter alia*:

"7. Furthermore, the Court ruled that Mr. Genson was barred from presenting any theory of defense in this case, specifically ruling that evidence concerning Mr. Genson's mental state during the month of November 2017 was inadmissible and irrelevant.

"8. Mr. Genson proffered evidence that would have established that Mr. Genson's mental condition during the month of November 2017 was unstable at best, and that Mr. Genson turned himself into the authorities on December 2, 2017. Law enforcement officers were so concerned with Mr. Genson's mental condition that he was nearly immediately transported to Osawatomie State Mental Hospital while the Riley County Attorney's Office filed a care and treatment case.

"9. The Court's ruling also effectively deprived Mr. Genson of his unquestioned Constitutional right to testify in his own defense in any meaningful way. Without being able to testify about what was taking place in his life during November 2017, the reason he turned himself into the authorities on December 2, 2017, his subsequent admission to Osawatomie State Hospital, or even his initial registration address in December 2017, Mr. Genson's potential trial testimony was essentially limited to stating his name for the record and immediately stepping down to return to the defense table.

"10. The foregoing is a significant and incurable error and was prejudicial to the defendant, effectively robbing him of any ability to defend himself.

5

"11. In addition, the exclusion of Mr. Genson's mental health evidence deprived the jury of their inherent power to convict only in appropriate circumstances, regardless of the evidence presented by the State."

Again, Genson raised no argument that his mental illness physically incapacitated him in November of 2017. Nor did he claim his failure to register was involuntary for purposes of 2020 Supp. K.S.A. 21-5201(a).

At sentencing, Genson's counsel argued the imposition of strict liability unconstitutionally "violates KORA offenders' due process rights under the Fifth and Fourteenth Amendments, essentially their substantive due process rights." The district court denied this motion. Even so, over the State's objection, the district court granted Genson both a durational and dispositional departure based on his mental health struggles and the de minimis nature of his late registration violation.

Genson appealed to the Court of Appeals, raising four issues related to his inability to present a defense based on his mental health in November 2017. Genson did not raise any new argument on appeal as to the physical voluntariness of his conduct under K.S.A. 2020 Supp. 21-5201(a) and did not claim he was physically unable to register. Instead, Genson argued that K.S.A. 2020 Supp. 21-5203(e) violated his substantive due process rights by making a KORA violation a strict liability crime. The panel disagreed, concluding the strict liability character of the offense was not unconstitutional under a rational basis review. 59 Kan. App. 2d at 200-16. The panel majority refused to address the rest of Genson's claims on a "prudential" basis because they were raised for the first time on appeal. 59 Kan. App. 2d at 200.

In response, Judge Atcheson authored a lengthy dissent criticizing the majority's substantive due process analysis. Judge Atcheson reasoned that statutes criminalizing conduct on a strict liability basis impact a fundamental liberty interest when they provide for "harsh penalties" and argued that such statutes should be subject to strict scrutiny. 59 Kan. App. 2d at 218, 229 (Atcheson, J., dissenting). Within that framework, Judge Atcheson concluded that the statutes at issue here were not narrowly tailored to advance any legitimate government objective and were thus unconstitutional and unenforceable. 59 Kan. App. 2d at 230-32 (Atcheson, J., dissenting).

Genson's petition for review to this court raised only three issues. This court granted review as to Genson's substantive due process claim only, which included a brief challenge to the panel's refusal to address his newly raised claims under section 1 and section 5 of the Kansas Constitution Bill of Rights. The court did not grant review of Genson's challenge to the constitutionality of K.S.A. 2020 Supp. 21-5209 or of his claims that section 5 of the Kansas Constitution Bill of Rights encompasses a right of jury nullification. We thus express no opinion on the merits of these arguments.

ANALYSIS

Genson challenges the panel's conclusion that K.S.A. 2020 Supp. 21-5203(e)'s imposition of strict liability for a KORA registration violation does not offend substantive due process under the United States Constitution, arguing the statute "infringes on an individual's liberty interest to remain free from incarceration on a felony offense absent proof of scienter." Before turning to the merits of Genson's overall substantive due process claim, we first address the panel's refusal to consider his two other newly raised due process claims under the Kansas Constitution.

7

*The panel did not abuse its discretion in refusing to consider Genson's newly raised claims on appeal.*

Before the district court, Genson did not clearly delineate his substantive due process arguments as arising either under the federal or the Kansas Constitutions. Instead, Genson mainly framed his arguments around his constitutional right to present a defense without specifically referencing either the Kansas or federal Constitutions—although, at sentencing, Genson's counsel invoked "due process rights under the Fifth and Fourteenth Amendments, essentially their substantive due process rights."

Appellate courts are obligated to address claims properly raised in district court and later appealed. But if a claim is not effectively raised below, the general rule gives appellate courts the discretion to refuse consideration of that issue. E.g., *State v. Hillard*, 313 Kan. 830, 839-40, 491 P.3d 1223 (2021).

Here, Genson concedes some of his claims were newly raised on appeal. This concession is critical to our assessment of the panel's decision not to consider them: if the issues were *not* being raised for the first time on appeal, the panel would not have had discretion to refuse to consider them. But since these arguments *were* newly raised before the panel, the panel could exercise its discretion to consider whether to apply a prudential exception to the general rule that issues not raised before the district court cannot be raised for the first time on appeal.

> "'A court abuses its discretion when its action is (1) arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would have taken the view adopted by the court; (2) based on an error of law, i.e., if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, i.e., if substantial competent evidence does

8

not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. The party arguing an abuse of discretion bears the burden of establishing that abuse.'" *State v. Aguirre*, 313 Kan. 189, 195, 485 P.3d 576 (2021) (quoting *State v. Corbin*, 311 Kan. 385, 390, 461 P.3d 38 [2020]).

Genson's newly raised claims are that K.S.A. 2020 Supp. 21-5203(e) violated his liberty and jury trial interests under section 1 and section 5 of the Kansas Constitution Bill of Rights. Genson points to no error of fact or law underlying the panel's refusal to consider these arguments for the first time on appeal, and we do not find that no reasonable jurist would have similarly refused. We thus affirm the panel's discretionary refusal to consider these arguments for the first time on appeal.

*K.S.A. 2020 Supp. 21-5203(e) does not violate substantive due process.*

We turn to Genson's claim that K.S.A. 2020 Supp. 21-5203(e) unconstitutionally impairs his substantive due process rights by making failure to register a strict liability felony. We conclude it does not.

*Standard of Review*

A statute's constitutionality is reviewed de novo on appeal. *State v. Cook*, 286 Kan. 766, 768, 187 P.3d 1283 (2008). Generally, appellate courts "presume that legislative enactments are constitutional and resolve all doubts in favor of a statute's validity." 286 Kan. at 768.

9

*Preservation*

Before we address Genson's claim, we first examine what is *not* before us. Genson has not framed his claim as a voluntariness challenge under K.S.A. 2020 Supp. 21-5201 either to this court, the panel, or the district court. His proffer did not suggest that he was physically incapable of registering in November 2017. Cf. *State v. Dinkel*, 311 Kan. 553, 560, 465 P.3d 166 (2020). Since he did not pursue such a claim or proffer evidence to support it, we do not consider whether Genson's mental illness might have impacted his theoretical ability to claim that his conduct was involuntary—or whether the district court erred in preventing Genson from presenting mental health evidence in general. Instead, we turn to the sole issue for which we granted review: whether the strict liability criminalization of failure to register under KORA violates substantive due process.

Even here, though, Genson's proffer gives us pause. His proffer does not establish the severity, nature, or genesis of his mental illness, although we can loosely infer that Genson believes the evidence would show he was not "cognizant" during some of November of 2017. Nevertheless, Genson's failure to register at any time during the month of November only became criminal at midnight on December 1, 2017; threadbare though it was, his proffer could support the inference that he was not cognizant on November 30, 2017. Thus we reach his claim that K.S.A. 2020 Supp. 21-5203(e) violates substantive due process by making his failure to register a strict liability felony, despite any lingering uncertainties concerning the facts about Genson's mental illness in general.

*Discussion*

Genson argues K.S.A. 2020 Supp. 21-5203 violates substantive due process because it impairs his liberty without proof of a culpable mental state (scienter) and because this crime is a felony that carries a serious potential sentence.

The Legislature has broad authority to craft criminal laws. *State v. Thomas*, 313 Kan. 660, 664, 488 P.3d 517 (2021). We recently upheld the Legislature's exercise of this authority in the context of a due process-based challenge to K.S.A. 2020 Supp. 21-5503(e), which, in most cases involving a rape charge, eliminated the defenses "that the offender did not know or have reason to know that the victim did not consent to the sexual intercourse, that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless." *Thomas*, 313 Kan. at 660. After noting the absence of anything "in our law suggesting due process prohibits the Legislature from adopting strict liability criminal offenses," 313 Kan. at 663, we approvingly quoted the *Genson* panel majority's analysis at some length:

> "'We begin with the well-established recognition that the Legislature has the authority to create strict liability crimes:
>
> > 'That it is within the power of the legislature to forbid the doing of an act and make its commission criminal, without regard to the intent or knowledge of the doer, is well established in our jurisprudence. [Citations omitted.]
>
> > . . . .
>
> > 'It is within the power of the legislature to declare an act criminal irrespective of the intent or knowledge of the doer of the act. In accordance with

11

this power, the legislature in many instances has prohibited, under penalty, the performance of specific acts. The doing of the inhibited act constitutes the crime, and the moral turpitude or purity of the motive by which it was prompted and the knowledge or ignorance of its criminal character are immaterial circumstances on the question of guilt. The only fact to be determined in these cases is whether the defendant did the act.' [Citations omitted.]" *Thomas*, 313 Kan. at 664 (quoting *Genson*, 59 Kan. App. 2d at 202).

Broad though the Legislature's authority may be, however, it is not unlimited:

"'While the legislature is vested with a wide discretion to determine for itself what is inimical to the public welfare which is fairly designed to protect the public against the evils which might otherwise occur, it cannot, under the guise of the police power, enact unequal, unreasonable or oppressive legislation or that which violates the Constitution. If the classification provided is arbitrary, . . . and has no reasonable relation to objects sought to be attained, the legislature transcended the limits of its power in interfering with the rights of persons affected by the Act.'" *Henry v. Bauder*, 213 Kan. 751, 753, 518 P.2d 362 (1974) (quoting *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 760, 408 P.2d 877 [1965]).

Indeed, when a statute deprives an individual of liberty, the Due Process Clause of the Fourteenth Amendment to the United States Constitution "imposes procedural and substantive due process requirements." *State v. Hall*, 287 Kan. 139, 143, 195 P.3d 220 (2008). Substantive due process "protects individuals from arbitrary state action," while procedural due process "protects the opportunity to be heard in a meaningful time and manner." *Creecy v. Kansas Dept. of Revenue*, 310 Kan. 454, 462, 447 P.3d 959 (2019). "Although freedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action,' . . . that liberty interest is not absolute." *Kansas v. Hendricks*, 521 U.S. 346, 356, 117 S. Ct. 2072, 138 L.

12

Ed. 2d 501 (1997) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 [1992]).

The United States Supreme Court has been "'reluctant to expand the concept of substantive due process'" beyond "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed[.]'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). So litigants raising substantive due process claims must set forth "a 'careful description' of the asserted fundamental liberty interest"—largely because "the Fourteenth Amendment 'forbids the government to infringe . . . "fundamental" liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" 521 U.S. at 721. Thus, Genson's claim can only succeed if he shows K.S.A. 2020 Supp. 21-5203(e) impairs a *fundamental* liberty interest or otherwise arbitrarily deprives him of a non-fundamental liberty interest.

Genson's claim that K.S.A. 2020 Supp. 21-5203(e)'s imposition of strict criminal liability violates his substantive due process rights rests on the interpretation and synthesis of various comments set forth in numerous cases decided by the United States Supreme Court and this court across the decades. But the Supreme Court has never declared that the legislative criminalization of conduct on a strict liability basis violates substantive due process. Many cases discussing strict liability crimes focus on questions of statutory interpretation, rather than claimed violations of due process. See, e.g., *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 66, 78, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994); *Staples v. United States*, 511 U.S. 600, 617-18, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978); *Morissette*, 342 U.S. 246, 261-63, 72 S. Ct. 240, 96 L. Ed. 288

13

(1952). In each case, the Court considered whether the lack of an explicit mens rea element in the definition of a crime conveyed a legislative intent to criminalize conduct on a strict liability basis; in each case, the Court found there was no such legislative intent. None of them directly addressed due process. Moreover, although *Morissette* explored "public welfare" offenses for which no mens rea element was required, the Supreme Court later clarified it "has never articulated a general constitutional doctrine of mens rea." *Powell v. State of Tex.*, 392 U.S. 514, 535, 88 S. Ct. 2145, 20 L. Ed. 2d 1254 (1968); *Morissette*, 342 U.S. at 254-61.

This case poses no question of statutory interpretation. The statute's plain language is clear that the crime of failure to register does not contain an accompanying mens rea element. We need not resort to legislative history or canons of construction to clarify the Legislature's intent, as the above-noted cases needed to.

Even so, the Supreme Court's caselaw further reflects a particular concern with the criminalization of otherwise innocent conduct on a strict liability basis. E.g., *X-Citement Video, Inc.*, 513 U.S. at 72 ("*Morissette*, reinforced by *Staples*, instructs that the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct."). No such concern is present here. An individual cannot commit the crime of failing to register under KORA without a duty *to* register—and without being given notice of that duty, as required by K.S.A. 2020 Supp. 22-4904(a)(1). See *State v. Juarez*, 312 Kan. 22, 25, 470 P.3d 1271 (2020). We therefore find these cases unpersuasive.

Kansas cases discussing the "public welfare" doctrine have also generally turned on questions of statutory interpretation. E.g., *State v. Lewis*, 263 Kan. 843, 857-58, 953 P.2d 1016 (1998) (driving while a "habitual violator" statute construed to include a mens

rea element); *State v. Mountjoy*, 257 Kan. 163, 177, 891 P.2d 376 (1995) (statute criminalizing unauthorized practice of the healing arts required no criminal intent under the public welfare doctrine).

Yet the Legislature's authority to craft laws remains subject to constitutional constraints. Cf. *State ex rel. Smith v. Fairmont Foods Co.*, 196 Kan. 73, 81, 410 P.2d 308 (1966) ("The case of *United States v. Balint* [258 U.S. 250, 252, 42 S. Ct. 301, 66 L. Ed. 604 (1922)], acknowledged the public welfare doctrine and found that, *under proper circumstances*, the absence of the scienter requirement in a criminal statute does not constitute a violation of due process." [Emphasis added.]).

Other courts have grappled with whether a crime, even serious crime, must have an element of scienter to be constitutional. Most address the criminality of action rather than the failure to act, but the seriousness of the crime alone does not make the imposition of strict liability unconstitutional. "It is well established that a criminal statute is not necessarily rendered unconstitutional because its definition of a felony lacks the element of scienter." *United States v. Engler*, 806 F.2d 425, 433 (3d Cir. 1986) (citing, for example, *Lambert v. California*, 355 U.S. 225, 228, 78 S. Ct. 240, 242, 2 L. Ed. 2d 228 [1957]). Moreover, "[t]he Supreme Court has indicated that the due process clause may set some limits on the imposition of strict criminal liability, but it has not set forth definite guidelines as to what those limits might be." *Engler*, 806 F.2d at 433.

With this context in mind, much of Genson's argument relies on an extrapolation of *Morissette*'s discussion of "public welfare" offenses. We are not convinced that *Morissette* sets forth a general substantive due process right to a scienter requirement, however. Only once has the Supreme Court found a due process violation in a strict liability ordinance. *Lambert*, 355 U.S. at 229-30. Coincidentally, *Lambert* involved an

15

ordinance criminalizing the failure to comply with a registration requirement, as we have here. Still, the *Lambert* majority found that ordinance unconstitutional *as applied* because the defendant had *no notice* of the statutorily created duty which criminalized his nonperformance—not facially unconstitutional because the ordinance lacked a scienter element. See *Lambert*, 355 U.S. at 227. Assessing Lambert's argument that the ordinance violated her due process rights, the majority wrote:

"We must assume that appellant had no actual knowledge of the requirement that she register under this ordinance, as she offered proof of this defense which was refused. The question is whether a registration act of this character violates due process *where it is applied to a person who has no actual knowledge of his duty to register*, and where no showing is made of the probability of such knowledge.

"We do not go with Blackstone in saying that 'a vicious will' is necessary to constitute a crime, for conduct alone without regard to the intent of the doer is often sufficient. There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition. But we deal here with conduct that is wholly passive—mere failure to register. It is unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed. The rule that 'ignorance of the law will not excuse' is deep in our law, as is the principle that of all the powers of local government, the police power is 'one of the least limitable.' On the other hand, due process places some limits on its exercise. Engrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed. Notice is required in a myriad of situations where a penalty or forfeiture might be suffered for mere failure to act. . . . These cases involved only property interests in civil litigation. *But the principle is equally appropriate where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case.*

"Registration laws are common and their range is wide. Many such laws are akin to licensing statutes in that they pertain to the regulation of business activities. But the present ordinance is entirely different. Violation of its provisions is unaccompanied by any activity whatever, mere presence in the city being the test. Moreover, circumstances which might move one to inquire as to the necessity of registration are completely lacking. . . . We believe that actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply are necessary before a conviction under the ordinance can stand. . . . *Where a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process. Were it otherwise, the evil would be as great as it is when the law is written in print too fine to read or in a language foreign to the community.* [Citations omitted.]" (Emphases added.) *Lambert* 355 U.S. at 227-30.

*Lambert* does not answer the question before us. First, notice—the core concern in *Lambert*—is traditionally associated with procedural due process, rather than substantive due process. See, e.g., *State v. Juarez*, 312 Kan. 22, 24, 470 P.3d 1271 (2020); *State v. Robinson*, 281 Kan. 538, 548, 132 P.3d 934 (2006) ("The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner."). That distinction is somewhat muddied since *Lambert* involved notice of *wrongdoing*, rather than notice of a hearing. Still, here the evidence shows Genson *did* know about his KORA registration obligations—at least during September and October 2017, and on December 15 as well. *Genson*, 59 Kan. App. 2d at 205. And even if Genson's stifled theory of defense might have hinged on the notion his mental illness obviated knowledge of his obligations during some part of November 2017— which he did not clearly argue—we cannot read his proffer to support such a claim. Consequently, Genson cannot rely on *Lambert* to establish a fundamental liberty interest here.

17

In the end, Genson is left with no persuasive legal authority to indicate the strict liability criminalization of his failure to register violates a fundamental liberty interest simply because such failure is classified as a felony.

We turn then to the question of arbitrariness. Like the Court of Appeals majority, we believe the rational basis test is the appropriate metric by which to evaluate this:

> "When a statute does not implicate fundamental rights, we ask whether it is 'rationally related to legitimate government interests.' 'The rational basis standard is a very lenient standard. All the court must do to uphold a legislative classification under the rational basis standard is perceive any state of facts which rationally justifies the classification.' In such cases, the government has no obligation to produce evidence or empirical data to sustain the rationality of a statutory classification. '[A]ny reasonably conceivable state of facts' will suffice to satisfy rational basis scrutiny. The burden falls on the party attacking the statute as unconstitutional to 'negative every conceivable basis which might support it.'

> . . . .

> "Genson fails to show that K.S.A. 2019 Supp. 21-5203(e) bears no reasonable relationship to the permissible legislative objective noted above. Rather, KORA meets the rational basis test because it is in the interest of government to protect the public from sexual and other violent offenders. [Citations omitted.]" *Genson*, 59 Kan. App. 2d at 212-13.

The majority's reasoning on this point is sound, and we affirm it in full. We thus conclude Genson has failed to show that K.S.A. 2020 Supp. 21-5203(e)'s strict liability criminalization of KORA registration violations violates his substantive due process rights.

18

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

\* \* \*

WILSON, J., concurring: I concur in the result reached by the majority on the narrow question before us. But I write separately to highlight the narrowness of this path.

Specifically, I concur in the majority's reasoning on the sole issue for which we granted review. I find little direct support in either *Morissette* or *Lambert* for the notion that substantive due process requires, as a matter of *fundamental* right, a legislature to include a scienter element in the definition of a crime—even a felony crime such as this. See *Morissette v. United States*, 342 U.S. 246, 72 S. Ct. 240, 96 L. Ed. 288 (1952); *Lambert v. California*, 355 U.S. 225, 78 S. Ct. 240, 2 L. Ed. 2d 228 (1957). Further, while I note the dissent's position that the Legislature has no "legitimate interest in making a previous violent offender's failure to register a strict liability crime[,]" (Rosen, J., dissenting), slip op. at 29, I cannot see a pathway in the case at bar to severing K.S.A. 2020 Supp. 21-5203(e)'s application to *violent* offenders from its application to sex offenders. For these reasons, I too conclude that Genson has not established a substantive due process violation arising solely out of K.S.A. 2020 Supp. 21-5203(e).

This court also affirmed the Court of Appeals majority's decision not to address two claims based on the Kansas Constitution for the first time on appeal. Because I agree that the majority did not abuse its discretion in refusing to consider these newly raised issues, I also concur in our court's decision not to reach them.

19

Nevertheless, I am troubled by the panel majority's conclusion that Genson was not prevented from presenting *any* defense because "a defendant who cannot rely on a lack of a mens rea may still have a defense that the voluntary act or omission requirement of the actus reus was not met" under K.S.A. 2020 Supp. 21-5201. *State v. Genson*, 59 Kan. App. 2d 190, Syl. ¶ 4, 481 P.3d 137 (2020). I acknowledge that Genson has not claimed that his failure to register was an involuntary act or omission, which, for purposes of K.S.A. 21-5201, we have interpreted to mean "'[a] willed bodily movement.'" *State v. Dinkel*, 311 Kan. 553, 560, 465 P.3d 166 (2020). We have also expressly drawn a distinction between the voluntary act requirement, or actus reus, and a culpable mental state, or mens rea:

> "A voluntary act is an intentional bodily movement, i.e., the intention to lift an arm or move a leg in a certain direction—whatever bodily movement is needed to complete the act requirement. In contrast, intentional mental culpability is the conscious desire to engage in conduct of a certain nature or produce a certain result—i.e., to desire injurious movement or a slap or a kick." *Dinkel*, 311 Kan. at 560.

But this interpretation, when combined with K.S.A. 2020 Supp. 21-5203(e) and K.S.A. 2020 Supp. 21-5209, creates a potential Catch-22 for defendants who suffer a physical incapacity that arises by virtue of a mental disease or defect—for instance, a hypothetical defendant suffering from a condition such as catatonia. Indeed, under K.S.A. 2020 Supp. 21-5209, a "mental disease or defect" defense is available *only* if it could establish that a defendant "lacked the culpable mental state required as an element of the crime charged." *Kahler v. Kansas*, 589 U.S. ___, 140 S. Ct. 1021, 1026, 206 L. Ed. 2d 312 (2020) ("In other words, Kansas does not recognize any additional way that mental illness can produce an acquittal."). Under an earlier statutory analogue of K.S.A. 21-

5209, this court recognized that evidence of a mental disease or defect that "did not tend to demonstrate that he was unable to form the requisite intent to commit the crimes charged" could not support a defense of mental disease or defect "and was therefore irrelevant." *State v. Pennington*, 281 Kan. 426, 438, 132 P.3d 902 (2006). And we have held that "culpable mental state" refers *only* to the statutorily defined terms in K.S.A. 2020 Supp. 21-5202(a): "intentionally," "knowingly," or "recklessly"; it does not include premeditation, which is not a statutorily established culpable mental state. *State v. McLinn*, 307 Kan. 307, 320-23, 409 P.3d 1 (2018).

As the majority has recognized, K.S.A. 2020 Supp. 21-5203(e) provides no culpable mental state for Genson's crime. Under *Pennington*, the statutory elimination of a culpable mental state from the elements of a crime would also eliminate the defense of mental disease or defect as *to* that crime and, thus, would render evidence of a defendant's mental illness irrelevant in all strict liability crimes. That a defendant's mental illness might result in physical incapacity may not currently create a statutory corridor permitting the consideration of mental health evidence in strict liability crimes. I find the constitutional implications of such a restriction troubling, although—because they are not before us—they do not impact my agreement with the majority's overall conclusion.

Although Genson briefly hinted at a physical incapacity argument to the district court—without either clearly articulating a voluntariness basis for the claim or proffering evidence to support such a claim—he has long since abandoned it, if indeed it was ever present to begin with. E.g., *Titterington v. Brooke Ins.*, 277 Kan. 888, Syl. ¶ 3, 89 P.3d 643 (2004) ("A point raised only incidentally in a party's brief but not argued in the brief is deemed abandoned."). And because this court declined to grant review of Genson's challenge to the constitutionality of K.S.A. 2020 Supp. 21-5209, the implications of the

21

potential elimination of a voluntariness defense to strict liability crimes—when physical incapacity arises as a byproduct of a mental illness—are beyond our purview.

In sum: Genson did not argue that he was physically *incapable* of registering in November of 2017; his proffer did not support such a claim; and even if he had proffered and argued it at the district court, he has now abandoned it. Consequently, despite my reservations, I find no error in the district court's ruling and concur in the majority's result.

STEGALL and WALL, JJ., join the foregoing concurring opinion.

* * *

ROSEN, J., dissenting:  Genson has asked this court to decide whether the Legislature has unconstitutionally trampled a deeply rooted fundamental right. Instead of considering this issue in full, the majority punts the question and justifies the targeted legislation as a valid exercise of police power. I cannot agree. Had our full court accepted its responsibility to uphold the Constitution, I suspect the analysis would show the Legislature violated the substantive due process protections of the Due Process Clause when it made the failure to register a strict liability crime for violent offenders. This is in line with Judge Atcheson's dissent—one that I find compelling. But even if I overlook the majority's failure to appropriately grapple with the substantive due process principles at play, I believe Genson is entitled to relief on other grounds. The majority concludes that the Legislature acted within its permissible realm because the targeted legislation survives rational basis review. But the majority offered no rational basis analysis. Through proper consideration, it is clear the Legislature acted outside of its police power.

22

Finally, I disagree with this court's decision to deny review on Genson's argument that the Legislature has unconstitutionally abolished the insanity defense. I find the claim troubling and the arguments in support persuasive. For these reasons, I dissent.

*Substantive Due Process*

The majority accurately captures the framework guiding the Legislature's use of police power and the constraints that substantive due process places on that power. The Legislature may enact laws, and such legislation is generally subject to rational basis review. But if the legislation infringes on certain fundamental rights, it must withstand strict scrutiny. This is because the substantive guarantee of the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). Consequently, when "challenged state action implicate[s] a fundamental right," the Constitution requires "more than a reasonable relation to a legitimate state interest to justify the action." *Glucksberg*, 521 U.S. at 721-22. The legislation is forbidden "'unless the infringement is narrowly tailored to serve a compelling state interest.'" *Glucksberg*, 521 U.S. at 721 (quoting *Collins*, at 302).

To decide whether targeted legislation has crossed the line triggering a higher level of scrutiny, a court decides whether it implicates a fundamental right or liberty that is "'deeply rooted in this Nation's history and tradition' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Glucksberg*, 521 U.S. at 721 (quoting *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 503, 97 S. Ct. 1932, 52 L. Ed. 2d 531 [1977]; *Palko v. Connecticut*, 302 U.S. 319, 325, 326, 58 S. Ct. 149, 152, 82 L. Ed. 288 [1937]). When it undertakes this analysis, the court looks "primarily to eminent common-law authorities (Blackstone, Coke, Hale, and the

like), as well as to early English and American judicial decisions." *Kahler v. Kansas*, 589 U.S.__, 140 S. Ct. 1021, 1027, 206 L. Ed. 2d 312 (2020) (citing *Montana v. Egelhoff*, 518 U.S. 37, 44-45, 116 S. Ct. 2013, 135 L. Ed. 2d 361 [1996]] [plurality opinion]; *Patterson v. New York*, 432 U.S. 197, 202, 97 S. Ct. 2319, 53 L. Ed. 2d 281 [1977]). The court must answer "whether a rule of criminal responsibility is so old and venerable—so entrenched in the central values of our legal system—as to prevent a State from ever choosing another." *Kahler*, 140 S. Ct. at 1028. In identifying the right at stake, the description must be "careful." *Glucksberg*, 521 U.S. at 721.

The majority declines to consider whether there is a fundamental interest at stake. Instead, it turns to rational basis because neither the Supreme Court nor any other court has previously declared the interest at stake here to be fundamental. In doing so, the majority abdicates its responsibility to ensure state action has not impermissibly encroached upon a fundamental right. "Upon the state courts, equally with the courts of the Union, rests the obligation to guard, enforce, and protect every right granted or secured by the constitution of the United States and the laws made in pursuance thereof, whenever those rights are involved in any suit or proceeding before them." *Robb v. Connolly*, 111 U.S. 624, 637, 4 S. Ct. 544,  28 L. Ed. 542 (1884); see also *Arizona v. Evans*, 514 U.S. 1, 8, 115 S. Ct. 1185, 131 L. Ed. 2d 34 (1995) ("State courts, in appropriate cases, are not merely free to—they are bound to—interpret the United States Constitution."); *Trainor v. Hernandez*, 431 U.S. 434, 443, 97 S. Ct. 1911, 52 L. Ed. 2d 486 (1977) ("'state courts have the solemn responsibility equally with the federal courts' to safeguard constitutional rights").

In brushing aside its responsibility, the majority avoids explicitly acknowledging that the Supreme Court has never considered whether the interest Genson advances today—being free from conviction of a serious, high-level felony punishable by lengthy

imprisonment based on inaction and without any knowledge of the facts that make one's conduct criminal—is a deeply rooted fundamental interest that deserves substantive due process protection. Without any command from the Supreme Court that it is not, and, in light of our decision to grant review of the constitutional question, we should uphold our duty to interpret and apply Supreme Court precedent and answer the question before us.

Had the majority addressed this question, I believe a correct analysis would likely show that the targeted legislation implicates a deeply rooted fundamental right. The Legislature has made a "violent offender's" failure to register a felonious crime punishable by up to 20 years in prison. See K.S.A. 2020 Supp. 22-4903; K.S.A. 2020 Supp. 21-6804. A longer lapse subjects the failed registrant to additional criminal charges and a longer sentence. See K.S.A. 2020 Supp. 22-4903. I see this as constitutionally problematic. The requirement that mental culpability accompany behavior deemed criminal is a concept embedded deep in our legal history. Blackstone wrote "to constitute a crime against human laws, there must be first, a vicious will; and secondly, an unlawful act consequent upon such vicious will." II Blackstone, Commentaries on the Laws of England, Book 4, chapter II. The United States Supreme Court has acknowledged this profoundly entrenched legal principle. In *Morissette v. United States*, 342 U.S. 246, 250-51, 72 S. Ct. 240, 96 L. Ed. 288 (1952), the Court wrote:

> "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory 'But I didn't mean to,' and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution. Unqualified acceptance of this

25

doctrine by English common law in the Eighteenth Century was indicated by Blackstone's sweeping statement that to constitute any crime there must first be a 'vicious will.'"

It is true the law has loosened its grip on mental culpability requirements in some cases—those regarding "'public welfare' or 'regulatory offenses.'" *Staples v. United States*, 511 U.S. 600, 606, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994). These typically "involve statutes that regulate potentially harmful or injurious items." *Staples*, 511 U.S. at 607. The Court has reasoned that sanctions for noncompliance with these statutes serve as an effective means of regulating potentially dangerous industries and are usually "light . . . , such as fines or short jail sentences." *Staples*, 511 U.S. at 616. The Court has pointed out that public welfare offenses "belong to a category of another character, with very different antecedents and origins" than the criminal offenses to which the common law has always attached a mens rea requirement. *Morissette*, 342 U.S. at 252.

The offense at issue in this case is not a public welfare crime. It is not a product of the Legislature's responsibility to regulate dangerous "industries, trades, properties or activities." *Morissette*, 342 U.S. at 254. Like the failure to register offense in *Lambert*, it severely criminalizes conduct that "is wholly passive—mere failure to register." *Lambert v. People of the State of California*, 355 U.S. 225, 228, 78 S. Ct. 240, 2 L. Ed. 2d 228 (1957). Moreover, it triggers serious penalties, unlike those in the public welfare realm. The offense is therefore more akin to those of which our legal history has relentlessly demanded a culpable mental state. This suggests to me that K.S.A. 2020 Supp. 21-5203(e) implicates a fundamental right deserving of substantive due process protection. Had the majority of this court correctly considered the issue, I think it would have decided the same.

If K.S.A. 2020 Supp. 21-5203(e) indeed implicates a deeply rooted liberty, it must withstand strict scrutiny to survive. *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993). In Kansas, stringent registration requirements were first adopted to allow law enforcement and the public to track the whereabouts of convicted sex offenders. Thus, the Legislature initially required only sex offenders to register and justified the requirement with a contention specific to sex offenders alone—that they reoffend at a high rate thereby creating a threat to the public at large. Then, several years later, the Legislature added violent offenders to the list of those required to register but left no legislative history offering a similar—or any—justification. Considering the absence of any reason for this expansion, there is no compelling justification for the inclusion of violent offenders. Furthermore, even assuming it serves to protect the public, the means used to enforce it—strict liability and harsh penalties—cannot be characterized as narrowly tailored to realize that result. There is no evidence that the harsh penalties and absent mens rea requirements are the least restrictive means of accomplishing this goal. KORA originally required a culpable mental state to prove failure to register and carried less severe, misdemeanor penalties. The State has offered nothing to suggest these were ineffective.

To me, this conclusively shows that the targeted legislation would crumble under strict scrutiny. In fact, it convinces me that the majority of this court erred when it concluded the legislation survives even rational basis review.

The rational basis barometer measures whether legislative action is "rationally related to legitimate government interests." *Washington v. Glucksberg*, 521 U.S. 702, 728, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). The majority of this court adopts the Court of Appeals majority's analysis on this point, which reasoned that a court must uphold legislation so long as it can come up with "'any reasonably conceivable state of

27

facts'" to "rationally justif[y] the classification." *Genson*, 59 Kan. App. 2d at 212. The panel majority offered a state of facts it found conceivable, opining that "it is in the interest of government to protect the public from sexual and other violent offenders" and that "[k]nowing where offenders live enables the public to assess the risk and take appropriate protective measures." 59 Kan. App. 2d at 210, 213.

I agree that the government has an interest in protecting the public from predatory sexual and violent offenses and, accordingly, from would-be offenders. But I fail to see how this equates to an interest in protecting the public from only those people who previously committed violent offenses. For a court to accept this position would be to turn mere conjecture—once a violent offender, always a violent offender—into a legal conclusion void of any supporting evidence. I am shocked and stunned by such reckless speculation, especially because our historical system of criminal justice explicitly counsels against it. "[A] presumption of innocence . . . is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453, 15 S. Ct. 394, 39 L. Ed. 481 (1895).

And the Legislature's original justification for KORA—that sex offenders reoffend at a comparatively high rate—fails to bridge the gap between previous violent offender and future violent offender. Not only does heavy suspicion hang over this representation, see Huffman, *Moral Panic and the Politics of Fear:  The Dubious Logic Underlying Sex Offender Registration Statutes and Proposals for Restoring Measures of Judicial Discretion to Sex Offender Management*, 4 Va. J. Crim. L. 241, 260 (2016) (citing studies to show "[r]esearch confirms that sex offenders pose no greater danger to the public than other criminal offenders"), the claim says nothing about recidivism among violent offenders. See also *State v. N.R.*, 314 Kan. 98, 125, 495 P.3d 16 (2021) (Rosen, J.,

28

dissenting) (discussing study showing recidivism of sex offenders is "remarkably low"). Without even an unsupported suggestion from the Legislature that violent offenders recidivate at a high rate, I will not presume they do. Nor will I use such a presumption to justify state-sanctioned ostracization and exclusion of those impacted from any sense of a normal existence. See *N.R.*, 314 Kan. at 124 (Rosen, J., dissenting) (discussing severe and onerous effects of registration and its "effective banishment").

Now I turn more to the point. Because I do not believe the Legislature has a reasonable interest in "protecting" people from individuals who previously committed violent offenses when the Legislature has made no suggestion or connection that these individuals are likely to reoffend, I see no legitimate interest in making a previous violent offender's failure to register a strict liability crime. The purpose seems clear—to eliminate most defenses to the crime, thereby reducing the prosecution's burden to secure a conviction for failing to register. But if the registration requirement itself serves no legitimate purpose, a simpler route to conviction is similarly void of any rational basis. Consequently, I would strike down K.S.A. 2020 Supp. 21-5203(e) as it relates to violent offenders.

Finally, I briefly acknowledge the compelling argument that the Legislature has violated substantive due process by eliminating the insanity defense. K.S.A. 2020 Supp. 21-5209 makes evidence of mental disease or defect a defense to only the mental culpability requirements of a crime. K.S.A. 2020 Supp. 21-5203(e) eliminates mental culpability requirements for the offense of failing to register. Thus, together, these statutes abolish the mental disease or defect defense, or, in other words, the insanity defense. Because "[f]ew doctrines are as deeply rooted in our common-law heritage as the insanity defense," *Kahler v. Kansas*, 589 U.S. ___, 140 S. Ct. 1021, 1039, 206 L. Ed.

29

2d 312 (2020) (Breyer, J., dissenting), this suggests the statutory scheme violates substantive due process.

In *Kahler*, the United States Supreme Court concluded K.S.A. 2020 Supp. 21-5209, on its own, does not violate due process. See 140 S. Ct. at 1037. It reasoned that the deeply entrenched insanity defense was still available in some capacity under the Kansas legislative scheme because the defendant could offer it to show they did not harbor the requisite mental state of a crime. *Kahler*, 140 S. Ct. at 1030-31. It also observed that it could be considered by a judge at sentencing. *Kahler*, 140 S. Ct. at 1031. But when a statute eliminates a mental culpability requirement, mental disease or defect is wholly irrelevant to innocence or guilt. I believe this is constitutionally suspect. Thus, I would have granted review on Genson's claim arguing the same and given it full consideration after opportunity for further briefing and argument.

In sum, I find it highly likely that K.S.A. 2020 Supp. 21-5203(e)'s applicability to violent offenders violates substantive due process because it implicates deeply rooted fundamental rights and fails to withstand strict scrutiny. But I think Genson's claim wins the day on a principle more basic than this. I believe the legislation fails to withstand even rational basis, and is, consequently, outside of the Legislature's police power. I would strike K.S.A. 2020 Supp. 21-5203(e) as it applies to violent offenders. Finally, I would have granted review of Genson's claim that the legislative scheme further violates substantive due process by abolishing the insanity defense and fully considered the claim.

STANDRIDGE, J., joins the foregoing dissenting opinion.